IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 1, 2021

## IN RE DAYLAN D. ET AL.

**Appeal from the Juvenile Court for Macon County**
**No. 2020-JV-68      Ken Witcher, Judge**

_____

### No. M2020-01647-COA-R3-PT

_____

Father appeals the termination of his parental rights on grounds of (1) abandonment by failure to support; (2) substantial noncompliance with permanency plans; (3) persistence of conditions; and (4) failure to manifest a willingness and ability to assume custody of the children. Although we vacate the trial court's finding of substantial noncompliance with permanency plans, we affirm the remaining grounds, as well as the trial court's determination that termination was in the children's best interests.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Vacated in Part; Affirmed in Part**

J. STEVEN STAFFORD, P. J., W.S., delivered the opinion of the court, in which THOMAS R. FRIERSON, II and W. NEAL MCBRAYER, JJ., joined.

Adam W. Parrish, Lebanon, Tennessee, for the appellant, Kenneth D.

Herbert H. Slatery, III, Attorney General and Reporter; Lexie A. Ward, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

## OPINION

### I.      FACTUAL AND PROCEDURAL HISTORY

The children at issue in this case, Daylan D.,[1] born in 2013, and Dixie H., born in 2015, were born to parents Evelyn H. ("Mother") and Kenneth D. ("Father"). This appeal

_____

[1] To protect the identity of children in parental rights termination cases, initials are used instead of last names.

concerns only the termination of Father's parental rights.[2]

In April 2019, the Tennessee Department of Children's Service ("DCS") received a referral concerning the children being exposed to drug use by Mother.[3] At the time, Father was hospitalized due to a serious work place injury; relatives were keeping the children at Mother and Father's home. Mother was drug-tested at the hospital and was positive for multiple substances; Father was not drug-tested at that time due to his hospitalization. A home visit to the parties' home showed that it was cluttered to the point of being difficult to get into, extremely messy, unsanitary and inappropriate. Drug paraphernalia that the children attributed to Mother was also found in the home. DCS asked Mother to complete some tasks, including an alcohol and drug assessment, but did not remove the children at that time.

DCS returned to the home in April 2019. Mother was paranoid during the visit, telling DCS investigator Rebecca Medeiros ("Investigator Medeiros") that the walls of the home had moved. Another urine drug screen on Mother tested positive for methamphetamines. Mother did not admit to her drug use, but informed DCS that Father used illegal drugs, including methamphetamines, prior to his accident. Mother reported that Father was violent toward her. The home had also deteriorated by the time of the second home visit, with dog feces on the floor.

As a result of this visit, DCS determined that removal was appropriate. After finding that none of the children's relatives were appropriate placements, DCS took custody of the children and placed them into a foster home. A protective custody order removing the children and placing them into DCS custody was entered by the Macon County Juvenile Court ("the juvenile court" or "the trial court") on April 11, 2019. On May 2, 2019, the juvenile court entered a preliminary hearing order finding probable cause that the children were dependent and neglected; Father was not present for the hearing because he was still hospitalized. The children were eventually adjudicated dependent and neglect by order of June 28, 2019; Father was present for this hearing and stipulated to the dependency and neglect finding.

Eventually, on June 15, 2020, DCS filed a petition to terminate Father's parental rights. The petition alleged as grounds against Father: (1) abandonment by failure to support; (2) substantial noncompliance with permanency plans; (3) persistence of conditions; and (4) failure to manifest a willingness and ability to assume custody of the children. A hearing on the petition occurred on October 22, 2020. Various DCS workers, the therapist who ran an intensive outpatient program ("IOP") that Father participated in,

_____

[2] Mother's parental rights were also terminated, but she did not appeal. According to Father's brief, Mother has since passed away. Regardless, because Father is the only party to this appeal, we will address facts relating to Mother only to the extent that they are relevant to Father's appeal.

[3] This was not the first time that DCS had contact with the family. Instead, there had been nineteen previous investigations, fourteen of which involved the children at issue in this case.

and foster mother testified; Father did not testify, though he was present for the hearing.

The proof showed that several permanency plans were created throughout the pendency of this case. The first plan was created in May 2019. Father did not participate in the creation of the plan because he remained hospitalized. Once Father was released from hospitalization later in May 2019, however, DCS family service worker Crystal Stinson ("FSW Stinson") explained the plan and its requirements to Father. FSW Stinson generally testified that she kept in touch with Father throughout her time on the case, explaining the permanency plans and helping Father complete the requirements.

Father's action steps for the first plan were as follows: (1) complete an alcohol and drug assessment and follow all recommendations; (2) submit to random drug screens and test negative for non-prescribed substances; (3) obtain an affidavit from a physician if prescribed narcotics; (4) comply with random pill counts; (5) complete a clinical parenting assessment and mental health assessment, and follow all recommendations; (6) sign releases of information to DCS for all providers; (7) avoid association with any known drug users; (8) maintain stable and legal source of income and provide proof to the Department; (9) maintain safe and appropriate housing; (10) provide proof of utility payments to the Department; (11) comply with announced and unannounced home visits; (12) visit the children two times per month; (13) follow all rules of probation and avoid incurring new charges; and (14) pay child support as ordered. As Father completed various assessments, certain items were removed or added to the plans that followed, including a new requirement that he continue individual counseling. Generally, however, Father's duties remained the same.

Among the permanency plans' requirements, the assessments and the recommendations that resulted therefrom were significant issues at trial. Father participated in the alcohol and drug assessment on June 5, 2019; the assessment resulted in recommendations that Father participate in individual counseling to focus on drug relapse prevention. Father set up the counseling through his own insurance on June 21, 2019. Between May 31, 2019, and August 20, 2019, Father was drug-tested once and tested negative for all substances other than those that he was prescribed.

Father also participated in mental health and parenting assessments in September 2019; DCS family service worker Jessica Carter ("FSW Carter") transported Father to some of the appointments necessary to complete these assessments. Due to insurance issues, however, DCS did not receive the report from the assessments until February 2020. The assessment resulted in recommendations that Father continue individual counseling, complete parenting education, and participate in random drug screening. The proof showed that Father had participated in this counseling, but that his attendance was "spotty." Father also never completed any parenting education class. Likewise, despite various efforts by DCS, Father never once allowed DCS to perform a pill count of his prescribed medication. He gave various excuses to the DCS workers for this failure, ranging from having forgotten

to having given the pill bottle to a relative, who lost the bottle.

Father did, however, participate in drug testing at various times during the pendency of this case, often funded by DCS. In November 2019, Father underwent hair follicle drug screening. The results of the drug screens were reported to DCS in early December 2019; Father was positive for methamphetamines and his prescribed medication. FSW Carter attempted to call Father to talk about the results, but he refused to keep in touch with her for a few weeks. When FSW Carter finally spoke with Father, she informed him that he would need to obtain a new alcohol and drug assessment.

Father completed the new assessment on January 28, 2020; the assessment recommended that Father complete IOP. Father began IOP treatment in February 2020 with First Step Recovery. In March 2020, a hair follicle drug screening indicated that Father was positive for methamphetamines at "4759 pg/mg"; the confirmation cut off for that substance was "500 pg/mg." Father was also positive for hydrocodone, but was able to produce a prescription. As a result, Father was discharged from IOP in April 2020.

Father began participating in IOP with a different group, Health Connect America in July 2020 with therapist Zachary Sapp. Father was initially slated to attend twenty IOP sessions, but the number was increased to thirty due to missed appointments for medical issues. Drug testing in August 2020 showed that Father was negative for all substances, including his prescription medications.[4] On September 2, 2020, however, Father underwent urine drug testing, which showed that he was positive for methamphetamine, along with his prescribed medications. Father admitted at that time to using methamphetamines. As a result, he signed a zero-tolerance form with his IOP indicating that he would be discharged upon another positive drug screening. Father was tested again on September 21, 2020; his urine drug screening again showed that he was positive for methamphetamines. Father was therefore discharged from IOP; the provider recommended that Father complete a higher level of care—that is, inpatient drug treatment.

Father eventually began inpatient substance abuse treatment at Mirror Lake on September 28, 2020. Father, however, voluntarily left the program on the basis that the provider would not allow Father to take his prescribed pain medication. Thus, Father never successfully completed any drug treatment program. Two weeks before trial, Father submitted to a final hair follicle drug screening paid for by DCS. He tested positive for methamphetamines, albeit at a far lower level than his previous hair follicle screening.

Father's home was also an issue at trial. The last home visit completed by DCS was in August 2019; the home was not appropriate. DCS attempted to perform a home visit in August 2020. DCS was not able to gain access to the property due to a locked gate. The

---

[4] FSW Carter, however, never received any documentation that Father was no longer prescribed opiates.

DCS worker, however, made no effort to call Father to gain access to the property. At trial, Father's counsel claimed that he had now moved in with paternal grandmother; Father did not testify to this fact. FSW Carter testified, however, that if Father had moved, she had not been informed of that fact prior to trial; as such, she was not able to perform any home visit for that residence. Moreover, Investigator Medeiros had previously testified that paternal grandmother's home was not an appropriate place for the children due to a "substantial" history of domestic assault charges.

Father's visitation was also discussed at trial. Father was generally present for most visitations, to which he often brought toys and gifts. But Father sometimes missed visitation or was thirty minutes late. On one occasion, the children cried when Father missed visitation. The next missed visitation, however, did not result in any emotional outburst of any kind form the children. According to foster mother Kimberly S. ("Foster Mother"), the children were often excited about the visits, not to see Father, but to receive presents. DCS workers who supervised visitations testified that they were appropriate and that the children separated from Father easily. Father, however, was not always interactive with the children during the visits. The visits never progressed beyond supervised visitation, although the reason for this lack of progression was not specifically discussed.

The children appear to be thriving in their current foster family, where they were placed six months prior to trial. Both children are above average students. They have also made progress with their emotions and fear since coming to the foster family. The children are bonded to both their foster parents and the five other children in the home. Daylan asked Foster Mother if he could call her "mom" within weeks of the placement. The foster family has also worked diligently to address a significant physical issue of Dixie's, which requires vigilant care, structure, and training to deal with. Foster Mother testified that her family hopes to adopt the children should they become available.

At the conclusion of trial, the trial court orally found that DCS presented sufficient proof of both the grounds for termination and best interests. On November 6, 2020, the trial court entered a written order finding clear and convincing evidence of all the grounds for termination against Father, as well as that termination was in the children's best interests. Father thereafter appealed to this Court.

## II.    ISSUES PRESENTED

As we perceive it, this appeal involves two issues:

1. Whether the trial court erred in finding clear and convincing evidence of grounds to terminate Father's parental rights?
2. Whether the trial court erred in finding clear and convincing evidence that termination was in the children's best interests?

## III.  STANDARD OF REVIEW

Parental rights are "among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016) (collecting cases). Therefore, "parents are constitutionally entitled to fundamentally fair procedures in parental termination proceedings." *Id.* at 511. These procedures include "a heightened standard of proof—clear and convincing evidence." *Id.* at 522 (citations and quotations omitted). "Clear and convincing evidence is evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (quotation marks and citation omitted).

In Tennessee, termination of parental rights is governed by statute, which identifies "'situations in which [the] state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove (1) the existence of at least one of the statutory grounds in section 36-1-113(g), and (2) that termination is in the child's best interest. *See In re Valentine*, 79 S.W.3d at 546. "Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases." *In re Addalyne S.*, 556 S.W.3d 774, 782 (Tenn. Ct. App. 2018). The clear and convincing evidence standard applicable here is "more exacting than the 'preponderance of the evidence' standard, although it does not demand the certainty required by the 'beyond a reasonable doubt' standard. To be clear and convincing, the evidence must eliminate any substantial doubt and produce in the fact-finder's mind a firm conviction as to the truth." *In re S.R.C.*, 156 S.W.3d 26, 29 (Tenn. Ct. App. 2004) (internal citation omitted).

In termination cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *See* Tenn. R. App. P. 13(d); *In re Carrington H.*, 483 S.W.3d at 523–24 (citations omitted). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* at 524 (citation omitted).

## IV. ANALYSIS

### A. Grounds for Termination

Although Father challenges only two of the four grounds for termination found by the trial court, we will consider each of the four grounds, as directed by our supreme court. *See In re Carrington H.*, 483 S.W.3d at 525–26 (holding that "in an appeal from an order

terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenge these findings on appeal"). The grounds at issue in this appeal are therefore: (1) abandonment by failure to establish a suitable home; (2) substantial noncompliance with permanency plans; (3) persistence of conditions; and (4) failure to manifest an ability and willingness to assume legal and physical custody or financial responsibility for the children.

### 1. Abandonment by Failure to Establish a Suitable Home

DCS first argues that Father abandoned the children by failing to establish a suitable home for them. Under Tennessee Code Annotated section 36-1-102(a)(1)(A)(ii), abandonment may be found under the following circumstances:

(a) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;
(b) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and
(c) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department;
. . . .

Providing a suitable home "requires more than providing a proper physical living location." *In re Navada N.*, 498 S.W.3d 579, 595 (Tenn. Ct. App. 2016) (citations, quotation marks, and alterations omitted). A parent's failure to address mental health issues can also lead to a finding that the parent has failed to establish a suitable home. *See, e.g.*, *In re Draven K.*, No. E2019-00768-COA-R3-PT, 2020 WL 91634, at *8 (Tenn. Ct. App. Jan. 7, 2020) ("Mother's failure to address her mental health issues renders her unable to

provide a safe and stable environment for the child and shows a lack of concern for the child and a lack of interest in regaining custody."); *In re Roderick R.*, No. E2017-01504-COA-R3-PT, 2018 WL 1748000, at \*12 (Tenn. Ct. App. Apr. 11, 2018) ("Mother's own failure to comply with her mental health treatment regimen demonstrated her lack of concern for the Children and resulted in her inability to provide a suitable home environment."). "In addition, a suitable home must be free from drugs." *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at \*7 (Tenn. Ct. App. Apr. 20, 2016) (citing *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at \*9 (Tenn. Ct. App. June 10, 2014) (citing *State, Dep't of Children's Servs. v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at \*3 (Tenn. Ct. App. Nov. 29, 2007))).

In this case, the trial court found that Father had never established a suitable home for the children, despite reasonable efforts by DCS. We agree. Here, the record shows that the children were removed from Father's home in the course of a dependency and neglect proceeding and placed in DCS custody. Tenn. Code Ann. § 36-1-102(a)(1)(A)(ii)(a). There appears to be no dispute that DCS either expended reasonable efforts to prevent the removal or that the situation prevented reasonable efforts from being made. Tenn. Code Ann. § 36-1-102(a)(1)(A)(ii)(b). The record is also replete with the efforts that DCS took to help Father establish a suitable home for the children both in the four months following the removal and throughout the pendency of this case. *Cf. In re Jakob O.*, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at \*13 (Tenn. Ct. App. Dec. 15, 2016) ("As long as the proof relates to 'a period of four (4) months following the removal,' Tenn. Code Ann. § 36-1-102(1)(A)(ii), the ground may be established. The statute *does not* limit the court's inquiry to a period of four months *immediately* following the removal."). This included keeping in touch with Father to inform him of appointments and visitations, creating and explaining permanency plans to Father, transporting both Father and the children to supervised visitation and other services, supervising visitation, helping Father to set up various services related to mental health and drug issues, obtaining funding for drug screenings, attempting to perform home visits and pill counts, putting in payment requests for parenting and domestic violence education.

While Father did make some effort, it was less than the effort expended by DCS. For example, while Father participated in two IOPs and one in-patient drug treatment, he failed to complete any drug treatment. And Father never made his pill bottles available for inspection by DCS, always providing some excuse over the approximately eighteen months of this custodial episode. Father did attend individual counseling, but his attendance was sometimes spotty. He also visited the children, but was sometimes late or he did not show up at all. At times, Father also failed to maintain contact with DCS. On the whole, DCS's efforts exceeded the effort expended by Father. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c).

And Father's home remains unsuitable for the children, in particular because Father

continued to use drugs even in the months before trial, despite knowing that the permanent termination of his parental rights was on the horizon.[5] In his brief, Father states that he "was passing all required drug screens at the time of trial." Respectfully, this is a gross mischaracterization of the proof at trial and the trial court's explicit findings. Here, a hair follicle drug test was administered to Father on October 8, 2020. This test indicated that Father was "positive" for methamphetamine at a rate of "540 pg/mg", which was above the "confirmation cut off" of "500 pg/mg." At trial, counsel for Father suggested that this was merely a residual of what Father had been taking in March 2020, months earlier. The trial court, however, specifically rejected this argument, finding that it was without merit. The evidence does not preponderate against this finding. Here, DCS workers testified that the hair follicle drug screening indicates drug use up to ninety days prior to the testing. While the October 2020 testing showed that Father's levels of illegal substances were far below the levels found in earlier testing, the October 2020 test indicates that Father had used drugs in the ninety days prior to the testing. He therefore did not "pass" this drug screening.[6]

The October 2020 hair follicle test was also not the only drug screen that Father failed after March 2020. Instead, Father underwent urine drug screening on September 2, 2020, which tested positive for methamphetamine; Father admitted at that time to using methamphetamine. Father again tested positive in a urine drug screening on September 21, 2020. According to the testimony about this test, the gap between the two September tests indicate that the tests show different instances of drug use.[7] Thus, there is ample evidence that Father was indeed continuing to use drugs in the months prior to trial, as reflected in the September and October drug screenings. Moreover, Father presented no proof of any negative drug testing in the Fall of 2020 or "at the time of trial."

Given Father's positive drug screenings and his failure to successfully complete any drug treatment, we must conclude that there are serious concerns that drug use was still an issue and had not in any way been remedied. Again, a home is not suitable where drug use is present. *See **In re Matthew T.*** 2016 WL 1621076, at *7. Thus, Father's lack of effort, particularly with regard to his drug use, demonstrates a lack of concern for the children to

---

[5] Father's physical home environment was also questionable. The home he had been staying at appeared abandoned shortly before trial and Father's counsel stated at trial that Father had recently moved in with paternal grandmother, giving DCS no time to perform a home visit for that residence. In his brief, Father notes that he now has "a permanent residence" with paternal grandmother; there was absolutely no proof presented of that fact at trial, as Father chose not to testify. Moreover, no home visit could be conducted on this home, and paternal grandmother was previously found unsuitable for placement due to a substantial history of domestic violence.

[6] Father's counsel admitted that Father did not pass this drug screening in his closing statement: "I would note that that number was [540], which is basically less than two-tenths of a point under the cutoff amount, meaning had it been just a little bit lower, he, he would have passed that hair follicle test for methamphetamine."

[7] Specifically, Mr. Sapp testified that "I suspected that there might have been continued use because there was enough gap in time between that last urine drug screen and then the one I just listed [] for that substance to have left the system. And so then, he was still continuing to pop positive."

such a degree that it appears unlikely that he will be able to provide a suitable home for the children at an early date. *Id.* This ground for termination is therefore affirmed.

## 2. Substantial Noncompliance with Permanency Plans

Pursuant to Tennessee Code Annotated section 36-1-113(g)(2), a ground for termination exists when "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4[.]" In this case, the trial court found that Father was not "in substantial compliance with the permanency plan[s]." The trial court noted that Father had done some things on the plan, but that this "does not constitute substantial compliance." On appeal, Father argues that he was not substantially noncompliant with the permanency plans requirements.

As an initial matter, we must take issue with the language and standard employed by the trial court. Specifically, despite the trial court's findings otherwise, section 36-1-113(g)(2) does not require that parents substantially comply with permanency plans, it requires those seeking to terminate parental rights demonstrate that the parent has been "substantially non-complian[t]." As this Court in *In re M.J.B.*, 140 S.W.3d 643 (Tenn. Ct. App. 2004), explained,

> Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn. Code Ann. § 36-1-113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003), and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. *In re Valentine*, 79 S.W.3d at 548–49; *In re Z.J.S.*, 2003 WL 21266854, at *12. Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. *In re Valentine*, 79 S.W.3d at 548; *Department of Children's Servs. v. C.L.*, No. M2001-02729-COA-R3-JV, 2003 WL 22037399, at *18 (Tenn. Ct. App. Aug. 29, 2003) (No Tenn. R. App. P. 11 application filed).

*Id.* at 656–57.

Here, the trial court's findings clearly indicate that it was addressing this question through the lens of whether Father had substantially complied with the permanency plans. Father's failure to substantially comply with the permanency plans is not, however, a

ground for termination. Instead, only his substantial noncompliance constitutes a ground for termination. *See* Tenn. Code Ann. § 36-1-113(g)(2). In other situations where the trial court had an incorrect focus in the termination of parental rights context, we have held that vacatur was appropriate unless other grounds exist to terminate the parent's parental rights. *See In re Travis H.*, No. E2016-02250-COA-R3-PT, 2017 WL 1843211, at *9 (Tenn. Ct. App. May 5, 2017) (citing In *re Abbigail C.*, No. E2015–00964–COA–R3–PT, 2015 WL 6164956, at *10 (Tenn. Ct. App. Oct. 21, 2015)) ("As discussed throughout this Opinion, however, other grounds exist to terminate Father's parental rights. In addition, as discussed, infra, we have affirmed the trial court's determination that termination is in the child's best interest. Thus, a determination that clear and convincing evidence exists to support the grounds of abandonment by an incarcerated parent through failure to visit and support is not necessary to uphold the termination of Father's parental rights. Under these circumstances, remanding for reconsideration of these grounds would only further prolong these proceedings without altering the outcome. Accordingly, we decline to remand this issue to the trial court for reconsideration."). Because the situation is the same in this case, we vacate the trial court's findings on this ground but also decline to remand for reconsideration of this ground for termination under the appropriate legal standard.

### 3. Persistence of Conditions

DCS also relies on persistence of conditions, pursuant to Tennessee Code Annotated section 36-1-113(g)(3):

(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

- 11 -

There is no dispute in this case that the children were removed from Father's custody for a period of six months by an order entered in a dependency and neglect action. Thus, the dispositive questions are whether conditions persist that prevent the safe return of the children, whether the conditions will likely be remedied at an early date, and whether the continued relationship prevents early integration of the children into a stable, permanent home. As we have previously explained,

> "A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (citing *In re T.S. & M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000)). The failure to remedy the conditions which led to the removal need not be willful. *In re T.S. & M.S.*, 2000 WL 964775, at *6 (citing *State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990)). "Where . . . efforts to provide help to improve the parenting ability, offered over a long period of time, have proved ineffective, the conclusion [] that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.* The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008)).

*In re Navada N.*, 498 S.W.3d 579, 605–06 (Tenn. Ct. App. 2016).

On appeal, Father argues that the basis for the trial court's removal was Mother's substance abuse, which had been remedied at the time of trial. Father also asserts that "there was incontrovertible proof that even though [Father] has previously briefly relapsed in his substance abuse, that [he] had completed [his] alcohol and drug assessments, and would be able to pass required drug screens at the time of trial." Respectfully, there was no such proof.

First, we emphasize that this ground for termination may be met when either the conditions that led to the removal persist or "other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian[.]" 36-1-113(g)(3)(A)(i). Thus, even if the initial reasons that the children were placed in DCS custody have been remedied, if other conditions continue to persist that make the home unsafe, this ground may still be shown.

- 12 -

It is true that Father had completed two alcohol and drug assessments. Those assessments, however, recommended that Father needed drug treatment, including IOP. Although Father started two separate IOPs, he never completed the entire series of treatments due to relapses. And Father never completed the in-patient treatment that was recommended upon his discharge from IOP. Thus, the proof shows that Father failed to successfully complete any drug treatment following the removal of the children.

Father also did not present "incontrovertible proof" that he could pass drug screenings at the time of trial. Instead, as previously discussed, his most recent drug screening was positive, albeit at a low level, for methamphetamine. Even considering the low level, however, this is not "incontrovertible proof" of anything except that Father used methamphetamines in some respect sufficient to test positive for that drug in the ninety days prior to trial. Indeed, Father tested positive for methamphetamines in early September 2020, and later admitted that he had used methamphetamines prior to that screening. Father again failed a drug test on September 21, 2020, which the testimony demonstrates likely indicated new drug use. Thus, the proof shows that Father was continuing to use drugs little more than one month prior to the trial in this case. Given this proof, it borders on the absurd to suggest that Father's October 2020 positive test constitutes affirmative "incontrovertible" proof that Father was free from drugs in the two weeks that followed that drug screening or that he was sober in the weeks leading up to trial. The proof in fact strongly supports the opposite finding that drug abuse remained an issue for Father even at the time of trial.

It is generally without dispute that a home where drugs are being abused is not safe for a child. *See, e.g., **In re Dacia S.**,* No. E2012-01337-COA-R3-PT, 2013 WL 709635, at *9 (Tenn. Ct. App. Feb. 26, 2013) (affirming the trial court's finding that "any ongoing drug issues would create a fully unhealthy and unsafe environment"). Consequently, a parent's failure to complete treatment to address their ongoing drug abuse issues may constitute a persistent condition for purposes of this ground. *See, e.g.*, ***In re Mynajah S.**,* No. E2021-00040-COA-R3-PT, 2021 WL 3520856, at *13 (Tenn. Ct. App. Aug. 11, 2021) ("Under these circumstances, we cannot conclude that Mother has taken the steps necessary to demonstrate that her drug issues have been remedied in the long-term."); ***In re Riley W.**,* No. E2017-01853-COA-R3-PT, 2018 WL 1256222, at *12 (Tenn. Ct. App. Mar. 12, 2018) (considering, inter alia, that the parents "have not addressed their illegal drug use"). Here, Father has drug abuse issues that have not been successfully treated. And drug testing indicates that he was using methamphetamine approximately ninety days prior to trial. And because of the length of time that Father has been aware of the need to address these issues without significant progress, even with the help of DCS, it appears unlikely that he will be able to make sufficient progress in the near future to allow a safe return of the children to his home. *See **In re Mynajah S.**,* 2021 WL 3520856, at *13; ***In re James W.**,* No. E2020-01440-COA-R3-PT, 2021 WL 2800523, at *13 (Tenn. Ct. App. July 6, 2021) (quoting ***In re T.S. & M.S.**,* No. M1999-01286-COA-R3-CV, 2000 WL

964775, at \*7 (Tenn. Ct. App. July 13, 2000)) ("When efforts made by DCS to help 'improve the parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified.'").

Finally, we conclude that continuing the relationship with Father deprives the children of early integration into a safe, stable, and permanent home. Here, this Court has serious concerns about Father's ability to maintain any level of sobriety, as the proof shows that he was abusing drugs even ninety days before trial and that he has not completed any form of drug treatment. Even Father's attorney agreed at trial that he could not take custody of the children at that time. By the time of trial, however, Father had approximately eighteen months to make himself an appropriate custodian for the children. In contrast, the children are currently in a loving, stable home that wishes to adopt them. Under these circumstances, the trial court did not err in finding that all of the elements of this ground for termination were met by clear and convincing evidence.

### 4. Failure to Manifest a Willingness and Ability to Assume Custody

The final ground upon which DCS relies is that Father failed "to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody . . . of the child[ren], and placing the child[ren] in [Father's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). As explained by our supreme court:

> [S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied.

*In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020) (citation omitted).

We begin with the willingness and ability prong. "Ability focuses on the parent's lifestyle and circumstances." *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at \*8 (Tenn. Ct. App. Mar. 22, 2019) (citing *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at \*7 (Tenn. Ct. App. Apr. 4, 2018)). "When evaluating willingness, we look for more than mere words." *Id.* (citing *In re Keilyn O.*, No. M2017-02386-COA-R3-PT, 2018 WL 3208151, at \*8 (Tenn. Ct. App. June 28, 2018)). "Parents demonstrate willingness by attempting to overcome the obstacles that prevent them from assuming custody. . . ." *Id.* Although we may consider evidence both before and after the petition was filed, *see In re Maya R.*, 2018 WL 1629930 at \*7, a parent's ability and willingness may be measured as of the time the petition is filed. *See In re Serenity W.*,

2019 WL 511387, at *7 (citing ***In re M.E.N.J.***, No. E2017-01074-COA-R3-PT, 2017 WL 6603658, at *7 (Tenn. Ct. App. Dec. 27, 2017)).

DCS argues that it has shown, at least, that Father failed to demonstrate a willingness to parent or care for the children. We agree. As previously discussed, Father has failed to take the concrete steps necessary to ensure that he is free from drugs in the long-term, such as successfully completing even a single drug treatment program or participating in DCS's pill counts. Father was informed repeatedly by DCS that drug use was a barrier to reunification. Father therefore failed to make a more than desultory effort to overcome the obstacles that prevented reunification with his children. Accordingly, DCS met its burden to show that Father failed to manifest a willingness to assume custody of the children.

The second prong of this ground involves whether the children would suffer substantial harm if returned to her custody. As we have explained regarding this prong:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

***Ray v. Ray***, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted). Here, we have affirmed the trial court's ruling that Father's drug issues are ongoing and render his home unsafe. This Court has held that these issues create a substantial risk of harm to a child. *See* ***In re Maya R.***, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (holding that the substantial harm prong was met when the parent had unaddressed drug issues and an unsafe home). As a result, this ground for termination is likewise affirmed.

## B. Best Interest

Because we have determined that at least one statutory ground has been proven for terminating Father's parental rights, we must now decide if DCS has proven, by clear and convincing evidence, that termination of Father's rights is in the children's best interests. Tenn. Code Ann. § 36-1-113(c)(2); ***White v. Moody***, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). If "the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child." ***In re Navada N.***, 498 S.W.3d at 607.

The statutory factors that courts should consider in ascertaining the best interest of the children include, but are not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).[8] "This list is not exhaustive, and the statute does not

---

[8] This is the version of section 36-1-113(i) that was in effect when the termination petition was filed. The Tennessee General Assembly amended the statutory best interest factors in 2021. *See* 2021 Tenn. Laws Pub. Ch. 190 (S.B. 205), eff. April 22, 2021. Neither party asserts that the revised version of the statute is applicable in this case.

require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005) (citations omitted).

Father's argument as to best interest is both misplaced and sparse. Father cites the best interest factors that are applicable to a custody decision, rather than a case involving termination of parental rights. *Compare* Tenn. Code Ann. § 36-1-113(i) (involving termination of parental rights), *with* Tenn. Code Ann. § 36-6-106 (involving custody in "suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child"). As a result, Father's brief contains no argument directly concerning even a single factor in section 36-1-113(i). Instead, Father largely relies on his consistent visitation with the children, the number of people in the foster home, and two facts of which there is absolutely no proof in the record: (1) that the children's mother has died, "render[ing] moot" the original basis for the removal; and (2) Father's "return and permanent residence with the Paternal Grandmother." Of course, we can only consider those facts that have been established by the evidence. *See* Tenn. R. App. P. 13(c) ("The Supreme Court, Court of Appeals, and Court of Criminal Appeals may consider those facts established by the evidence in the trial court and set forth in the record and any additional facts that may be judicially noticed or are considered pursuant to Rule 14."); *Hathaway v. Hathaway*, 98 S.W.3d 675, 681 (Tenn. Ct. App. 2002) (holding that statements of counsel are not evidence). Still, we will review the factors and the trial court's findings to determine if clear and convincing evidence was presented in support of termination. *See In re Carrington H.*, 483 S.W.3d at 525–26.

In this case, the trial court found that the first two factors concerning Father's adjustment of circumstances favored termination. *See* Tenn. Code Ann. § 36-1-113(i)(1), (2). The evidence supports these findings, as the proof showed that Father tested positive for drugs just two weeks prior to the termination trial, despite the considerable assistance offered to him by DCS. Thus, Father has not made a lasting adjustment in his circumstances and appears unlikely to be capable of doing so in the near future.

The trial court also found the factor concerning visitation to favor termination. *See* Tenn. Code Ann. § 36-1-113(i)(3). Father minimally takes issues with this finding in his brief. We agree that this factor does not appear to favor termination. Here, the evidence on visitation was not lengthy but generally showed that Father attended all but two visitations in the months leading up to trial. While there was some testimony that Father did not interact well with the children at some visitations, this proof was vague, sparse, and in contrast to proof that Father was appropriate at visitation. As a result, this factor does not weigh in favor of termination.

The evidence does support, however, the trial court's finding that Father does not have a meaningful relationship with the children and that a change in caretakers would be detrimental to them. *See* Tenn. Code Ann. § 36-1-113(i)(4), (5). Here, the children do not

appear to be particularly bonded to Father. Although they are happy to participate in visitation, he sometimes does not interact with them, and they appear more excited over the presents that they receive than the time they are permitted to spend with Father. Additionally, the proof shows that at least one child has medical issues that require considerable care. The foster family has adapted well to these issues and both children are thriving. In fact, the foster family is well able to care for the children despite having several other children in the household; in contrast, Father was not able to address his issues even when he was caring only for himself. Removing the children from this foster family and placing them with Father would therefore be detrimental to the children.

The trial court also found that while the testimony about domestic violence in the home weighs in favor of DCS, it did not have considerable weight due to the dearth of testimony on this issue. *See* Tenn. Code Ann. § 36-1-113(i)(6). We generally agree. Here, DCS workers testified to allegations of domestic violence that Mother made against Father, as well as seeing her afraid of him. But the proof showed that Mother had been convicted of filing a false police report, indicating that she had lied in the past. As a result, we agree that this factor carries little weight.

The trial court found, however, that the physical environment of Father's home was neutral. *See* Tenn. Code Ann. § 36-1-113(i)(7). Although we have concerns about Father's continued drug use, DCS does not assert that this finding was in error. *Cf.* ***In re Jayda J.***, No. M2020-01309-COA-R3-PT, 2021 WL 3076770, at *28 (Tenn. Ct. App. July 21, 2021), *no perm. app. filed* ("DCS offers no argument as to this factor. We therefore agree that it favors Mother."). Likewise, the trial court did not make any findings concerning Father's payment or non-payment of child support, so we must conclude that this factor weighs against termination. *See* Tenn. Code Ann. § 36-1-113(i)(9); *cf.* ***In re Taylor B.W.***, 397 S.W.3d 105, 113 (Tenn. 2013) (affirming the trial court's holding that the absence of proof as to a factor meant the factor did not favor termination); ***In re Malachi M.***, No. E2020-00561-COA-R3-PT, 2020 WL 6819195, at *9 (Tenn. Ct. App. Nov. 20, 2020) (holding that the lack of evidence to a factor meant the factor "weigh[ed] against terminating Father's parental rights"). But the trial court found that the mental health issues weigh in favor of termination, which is supported by the record. *See* Tenn. Code Ann. § 36-1-113(i)(8). Although Father participated in mental health counseling, his attendance was spotty, and by the time of trial, he still had not completed the recommended drug rehabilitation or parenting education course that his assessments recommended.

Thus, while not all the factors in this case favor termination, more factors weigh in favor of termination than weigh against it. But we do not determine the best interest of a child merely by totaling the number of factors that weigh for or against termination; instead, that determination often depends on the relevancy and weight of each factor. *See* ***In re I.E.A.***, 511 S.W.3d 507, 518 (Tenn. Ct. App. 2016) (quoting ***In re Audrey S.***, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Importantly, Father had still not made an

adjustment of circumstances by the time of trial to suggest that he will be able to maintain sobriety long-term; he was still abusing drugs in the months before trial, and he has never successfully completed even a single drug rehabilitation program, despite assistance from DCS. Moreover, the children here have a good chance of a permanent, stable home with a family to whom they are strongly bonded. It simply does not serve their best interests to delay their permanency in the hope that Father will eventually get his life together. *Cf.* ***In re C.B.W.***, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *8 (Tenn. Ct. App. June 26, 2006) ("[L]ong term foster care, with the instability and insecurity inherent therein, is disfavored under the public policy established by the legislature and is seldom in a child's best interest[.]"). As a result, the trial court's determination that termination of Father's parental rights is in the best interest of the children is affirmed.

## V. CONCLUSION

The judgment of the Macon County Juvenile Court is vacated in part and affirmed in part. As a result, the termination of Appellant, Kenneth D.'s, parental rights is affirmed, and this cause is remanded for further proceedings as are necessary and consistent with this Opinion. Costs of this appeal are taxed to Appellant, Kenneth D., for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE

- 19 -